NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0310n.06

Case No. 25-5760

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| LARRY RAY COFFMAN, | ) | KENTUCKY |
| Defendant-Appellant. | ) | |
| | ) | OPINION |
| | ) | |

FILED

Jul 17, 2026

KELLY L. STEPHENS, Clerk

Before: DAVIS, MATHIS, and RITZ, Circuit Judges.

**MATHIS, Circuit Judge.** Larry Coffman persuaded two minors to engage in sex acts with him in exchange for the purchase of tennis shoes. A jury found him guilty of two counts of commercial sex trafficking of children and one count of committing a felony offense involving a minor while required to register as a sex offender. The district court sentenced him to 480 months' imprisonment. Coffman argues that the trial evidence was insufficient to support his convictions and that the district court imposed a procedurally unreasonable sentence. We affirm.

**I.**

In 2005, Coffman was convicted in state court for raping and sodomizing two young girls. Those convictions required him to register as a sex offender for life.

After serving his sentence, Coffman began a polyamorous relationship with two women, Kamillia Morris and Janelle Croft. By 2023, Morris lived with Coffman in his apartment. Morris's minor daughter (Victim One) lived with her stepfather but stayed with her mother and Coffman

on the weekends. Croft lived in the same apartment building as Coffman. Croft's minor daughter (Victim Two) lived with her mother but often stayed over at Coffman's apartment. Both girls viewed Coffman as a father figure. Victim Two testified that she believed Coffman "loved [her] unconditionally" and "would never hurt [her]." R. 56, PageID 381. But Coffman betrayed that trust.

In March 2023, Victim One and Victim Two invited some friends from school to a slumber party at Coffman's apartment. During the party, Coffman provided the girls with alcohol, marijuana, and gabapentin pills. Several girls became ill. Soon after, the assistant principal at Victim One's middle school learned about the slumber party and that Coffman provided the girls with drugs and alcohol. He contacted local law enforcement.

During the investigation, law enforcement interviewed Victim One and Victim Two. The girls described instances of sexual grooming and escalating sexual abuse that culminated in Coffman having sex with each of them about a month before the slumber party. They stated that Coffman solicited sex from them in exchange for $200 Nike Air Jordan shoes.

The girls also shared with investigators that Coffman kept a "sex book" that listed his past sexual partners. *Id.* at 393. Victim Two would testify at trial that Coffman told her, "Victim [One] was already [number] 68, and that it was a done deal," and Victim Two would be number 69 "because [she] was his favorite." *Id.* at 390–91. Law enforcement found that book during their investigation. And while in jail, Coffman sent Morris a letter about the slumber party. Law enforcement intercepted the letter. In the letter, Coffman told Morris that they needed to tell the same story about what happened at the slumber party.

The government charged Coffman with two counts of commercial sex trafficking of children, in violation of 18 U.S.C. § 1591(a)(1), and one count of committing a felony sex offense

involving a minor while required to register as a sex offender, in violation of 18 U.S.C. § 2260A. Coffman exercised his constitutional right to a jury trial.

At trial, Victim One testified that Coffman told her repeatedly that if she "had sex with him," he would buy her the Nike shoes she wanted. *Id.* at 417–18. One day, while Victim One was in the bedroom, Coffman came into the room, took off his clothes, asked Victim One if she was "ready," and then sexually assaulted her. *Id.* at 419. Afterward, Coffman showed Morris the shoes Victim One wanted on Nike.com and gave Morris $200 to buy them. Victim One shared her story with investigators because she became "really depressed" and "could barely sleep at night" due to Coffman's actions. *Id.* at 422.

Victim Two testified that Coffman told her "every single day" for about a month that if she had sex with him, he would buy her Nike shoes. *Id.* at 385. Victim One also told Victim Two that Coffman bought her Nike Air Jordan shoes after the sex. Soon after learning this, Victim Two agreed to Coffman's deal. And after Coffman sexually assaulted Victim Two, he "slid $200 in [her] back pocket" while she was at a family party, "slapped [her] butt, and said, [']Thanks, baby girl,['] and walked away." *Id.* at 392. When Victim Two arrived home from the party, she gave her mother the money. She told Croft that Coffman paid her for "chores." *Id.* Croft then purchased the shoes for her daughter from Nike.com. Victim Two testified that she wore the shoes only once and then "never touched them" again. *Id.* She got a sick feeling in her stomach every time she saw the shoes in her closet.

At the close of the government's case, Coffman moved for a judgment of acquittal. The district court denied the motion.

Coffman then testified in his own defense. He denied having sex with Victim One or Victim Two or ever treating them inappropriately. He also denied offering to buy the girls shoes

in exchange for sex. At the close of trial, Coffman renewed his motion for a judgment of acquittal. The district court denied the motion once more. In the end, the jury found Coffman guilty on all counts.

The case proceeded to sentencing. The district court applied a two-level obstruction-of-justice enhancement to Coffman's advisory Sentencing Guidelines range over his objection. The court found that the enhancement applied based on Coffman's perjured trial testimony. The court then imposed a 480-month within-Guidelines sentence.

Coffman challenges his convictions and sentence.

## II.

Coffman first argues that the government presented insufficient evidence to prove to the jury beyond a reasonable doubt that he violated 18 U.S.C. § 1591(a)(1) and 18 U.S.C. § 2260A. "We review de novo the sufficiency of the evidence to sustain a conviction." *United States v. Emmons*, 8 F.4th 454, 477 (6th Cir. 2021) (emphasis omitted) (citation modified). In doing so, we ask "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Musacchio v. United States*, 577 U.S. 237, 243 (2016) (quotation omitted). Our inquiry "essentially addresses whether the government's case was so lacking that it should not have even been submitted to the jury." *United States v. Goldy*, 164 F.4th 493, 501 (6th Cir. 2026) (quotation omitted). In considering a sufficiency-of-the-evidence challenge, we leave it to the jury "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Musacchio*, 577 U.S. at 243 (quotation omitted).

**A.**

We begin with Coffman's convictions for violating 18 U.S.C. § 1591(a)(1). Congress enacted § 1591 as part of the Trafficking Victims Protection Act of 2000 (TVPA), Pub. L. No. 106–386, 114 Stat. 1464. The TVPA aims "to combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect their victims." 22 U.S.C. § 7101(a). Congress found that "[t]he sex industry has rapidly expanded over the past several decades. It involves sexual exploitation of persons, predominantly women and girls, involving activities related to prostitution, pornography, sex tourism, and other commercial sexual services." *Id.* § 7101(b)(2). And due to this rapid expansion, "[t]raffickers primarily target women and girls, who are disproportionately affected by poverty, the lack of access to education, chronic unemployment, discrimination, and the lack of economic opportunities." *Id.* § 7101(b)(4).

Section 1591(a)(1) criminalizes, among other things, the commercial sex trafficking of children. To sustain a conviction under this provision, the government must prove three elements. First, the government must prove that the defendant knowingly "recruit[ed], entice[d], harbor[ed], transport[ed], provide[d], obtain[ed], advertise[d], maintain[ed], patronize[d], or solicit[ed] by any means a person." 18 U.S.C. § 1591(a)(1). Second, the government must prove that the defendant, having "had a reasonable opportunity to observe the person so recruited, enticed, harbored, transported, provided, obtained, maintained, patronized, or solicited," knew or recklessly disregarded "the fact . . . that the person ha[d] not attained the age of 18 years and w[ould] be caused to engage in a commercial sex act." *Id.* § 1591(a), (c). And third, the government must prove the offense took place "in or affecting interstate or foreign commerce." *Id.* § 1591(a)(1).

Coffman challenges only the interstate-commerce element. He argues that the government failed to adduce sufficient evidence to establish that his conduct was in or affecting interstate commerce. He explains that all communications and sexual acts involving Victim One and Victim Two occurred at his home in Kentucky.

The U.S. Constitution's Commerce Clause grants Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. The Supreme Court has identified three categories of activities that Congress can regulate using its commerce power. *Gonzales v. Raich*, 545 U.S. 1, 16 (2005). "First, Congress can regulate the channels of interstate commerce. Second, Congress has authority to regulate and protect the instrumentalities of interstate commerce, and persons or things in interstate commerce. Third, Congress has the power to regulate activities that substantially affect interstate commerce." *Id.* at 16–17 (citation modified).

Section 1591(a)(1) uses the phrase "in or affecting interstate or foreign commerce." That phrase is a term of art that "ordinarily signal[s] the broadest permissible exercise of Congress' Commerce Clause power." *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2003) (per curiam); *see also Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 115 (2001) (noting that "[t]he phrase 'affecting commerce'" signals "Congress' intent to regulate to the outer limits of its authority under the Commerce Clause"). That power thus extends to "purely local activities that are part of an economic class of activities that have a substantial effect on interstate commerce." *Raich*, 545 U.S. at 17 (citation modified). Here, a rational jury could find that Coffman's conduct satisfies § 1591(a)(1)'s interstate-commerce element because he orchestrated an interstate transaction in exchange for sex acts.

As an initial matter, Coffman stipulated at trial that both pairs of Nike shoes were manufactured outside the United States, purchased via the internet, and shipped to Kentucky in interstate commerce. "[W]e have held that the internet is a means of interstate commerce." *United States v. Clark*, 24 F.4th 565, 573 (6th Cir. 2022) (collecting cases).

Additionally, to help facilitate the purchase of shoes for Victim One and Victim Two, Coffman used his cell phone to "search[] for Air Jordan high women's shoes from Nike.com." R. 56, PageID 357. Cell phones "qualify as instrumentalities of interstate commerce even when a defendant does not use them to make interstate calls." *United States v. Allen*, 86 F.4th 295, 301 (6th Cir. 2023) (citation modified).

Most significantly, Victim One's and Victim Two's mothers purchased the shoes online with money provided by Coffman. Although Coffman argues that his actions did not affect interstate commerce because the mothers ordered the shoes, Coffman provided the money specifically for Victim One's and Victim Two's shoes. As Morris testified, "me and Mr. Coffman were going to purchase shoes for Victim [One]." R. 57, PageID 480. And Coffman admitted that he let Victim One pick out the shoes she wanted, he showed Morris the shoes to buy online, and Morris ordered them. Coffman also gave Victim Two the money to buy the shoes. And when Croft ordered the shoes for her daughter, she knew that the money came from Coffman. So Coffman's paying for and coordinating the purchase of shoes that traveled in interstate commerce is evidence that his conduct substantially affected interstate commerce. For example, in *United States v. Willoughby*, we concluded that the government satisfied § 1591(a)(1)'s interstate-commerce element where the defendant used a cell phone made in China to further sex-trafficking activities and purchased condoms and clothes that were manufactured out of state for the victim to

use while prostituting.  742 F.3d 229, 240 (6th Cir. 2014), *overruled on other grounds by Johnson v. United States*, 576 U.S. 591 (2015).

**B.**

We turn next to Coffman's conviction under 18 U.S.C. § 2260A.  That statute makes it a crime for a registered sex offender to "commit[] a felony offense involving a minor under section . . . 1591."  18 U.S.C. § 2260A.  Coffman argues that because the government failed to prove that he violated § 1591(a)(1), his conviction under § 2260(A) must fail as well.  But we have upheld Coffman's § 1591(a)(1) convictions, so Coffman cannot show that there was insufficient evidence to sustain his § 2260A conviction.

**III.**

Coffman also challenges the procedural reasonableness of his sentence.  A district court imposes a procedurally unreasonable sentence by "failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the [18 U.S.C.] § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." *Gall v. United States*, 552 U.S. 38, 51 (2007).

Coffman argues that the district court improperly calculated his Guidelines range when it applied an obstruction-of-justice enhancement to his sentence under U.S.S.G. § 3C1.1.  We review a district court's application of a perjury-based obstruction-of-justice enhancement for clear error. *United States v. Jackson*, 154 F.4th 422, 427–28 (6th Cir. 2025).  Under this standard, "[i]f the district court's view of the evidence is plausible in light of the entire record, an appellate court may not reverse even if it is convinced that it would have weighed the evidence differently in the first instance." *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 687 (2021).  In other words, "[c]lear error will be found only when the reviewing court is left with the definite and firm

conviction that a mistake has been committed." *United States v. Loines*, 56 F.4th 1099, 1105 (6th Cir. 2023) (quotation omitted).

The obstruction-of-justice enhancement applies if the defendant has "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction." U.S.S.G. § 3C1.1. The obstructive conduct must also relate to "(A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense." *Id.* Obstruction of justice includes committing perjury. *Id.* § 3C1.1. cmt. n.4; *see also Jackson*, 154 F.4th at 427.

To impose the obstruction-of-justice enhancement, the district court must "make independent findings necessary to establish a willful impediment to, or obstruction of, justice." *Jackson*, 154 F.4th at 429 (quotation omitted). To that end, a district court must satisfy two requirements to impose an obstruction-of-justice enhancement for perjury. *Id.* "[F]irst, it must identify those particular portions of the defendant's testimony that it considers to be perjurious." *United States v. Mooney*, 135 F.4th 486, 501–02 (6th Cir. 2025) (quotation omitted). And "second, it must either make specific findings for each element of perjury or at least make a finding that encompasses all of the factual predicates for a finding of perjury." *Id.* at 502 (quotation omitted). "Those perjury predicates are threefold: The defendant must have given (1) false testimony that (2) was willful and (3) concerned a material matter." *Jackson*, 154 F.4th at 429 (citation modified).

Coffman filed an objection to the anticipated imposition of the obstruction-of-justice enhancement before sentencing. He argued that he did not commit perjury because he testified truthfully at trial that he did not engage in sexual contact with the minor victims. He also contended that the application of the enhancement would penalize him for exercising his constitutional right to defend himself at trial. At sentencing, the district court asked Coffman's

counsel if he would like to add anything to his objection, and his counsel declined to do so. The district court then overruled Coffman's objection and found that the obstruction-of-justice enhancement applied because Coffman perjured himself during his trial.

On appeal, Coffman contends that the district court failed to make sufficient factual findings to support a perjury-based obstruction-of-justice enhancement. We disagree.

First, the court identified the portions of Coffman's testimony that it considered perjurious. *See Mooney*, 135 F.4th at 501–02. This testimony included Coffman's assertions that he "never had sex with [the victims]," he "never touched them inappropriately," he "never treated them as a prostitute by buying them the shoes," and that he purchased the shoes "as birthday presents and not as enticements for sexual favors." R. 57, PageID 569; R. 58, PageID 665, 668. As the district court noted, the crux of Coffman's testimony was that he never had sex with Victim One or Victim Two.

Second, the district court made a finding that encompassed all the factual predicates for a finding of perjury. *See Mooney*, 135 F.4th at 501–02. It concluded that Coffman's testimony was false because a wealth of other evidence in the record—including Coffman's sex book "in which he had crossed out the entry with the name consistent with Victim [One] having had oral sex"— directly contradicted his testimony. R. 58, PageID 669. The district court also determined that Coffman's testimony was willful because he engaged in "an active effort" to mislead the jury and his "denial was more than just saying no." *Id*. And the testimony concerned a material matter because Coffman attempted "to convince the jury that he did not engage in sex with the victims." *Id*. The district court thus did not commit clear error by finding that Coffman perjured himself.[1]

---

[1] Coffman also challenges the district court's alternate basis for imposing the obstruction-of-justice enhancement: Coffman's jailhouse letter to Morris about "get[ting] their stories straight" about the slumber party. D. 25 at pp.38–

**IV.**

For the reasons above, we **AFFIRM** the district court's judgment.

---

39. But because the court did not commit clear error by imposing the enhancement based on Coffman's perjury during his trial, we need not address this argument.